**SAHA THAI STEEL PIPE CO., LTD, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Allied Tube Corporation, Defendant–Intervenor.**

Slip Op. No. 95–21.
Court Nos. 92–09–00647, 92–09–00635.

United States Court of International Trade.

Feb. 14, 1995.

Dickstein, Shapiro & Morin, Washington, DC (Arthur J. Lafave III and Douglas N. Jacobson), for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, (Vanessa P. Sciarra, Robert Krask), and Wendell L. Willkie, Gen. Counsel, U.S. Dept. of Commerce; Jeffrey B. Denning, U.S. Dept. of Commerce, Office of Chief Counsel for Import Admin., Washington, DC, of counsel, for defendant.

Schagrin Associates, Washington, DC (Roger B. Schagrin, R. Alan Luberda, and Gail S. Usher), for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

MUSGRAVE, Judge.

Plaintiff Saha Thai Pipe Company ("Saha Thai") challenges the final determination of defendant, Department of Commerce, International Trade Administration ("Commerce"), in *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 38,668 (Aug. 26, 1992) ("*Final Results*"), denying Saha Thai its claimed by-product credit for flat bar production. Instead of removing the by-product credit and raw material costs associated with flat bar from Saha Thai's costs of producing prime quality pipe, Commerce recalculated the value of the by-product credit by treating the narrow coil input into flat bar as if it were steel scrap, effectively raising Saha Thai's costs of production for steel pipe and tube. Defendant–Intervenor, Allied Tube and Conduit Corporation ("Allied"), supports Commerce's conclusion regarding the flat bar credit, but opposes Commerce and Saha Thai on two other issues: (1) whether it is appropriate for Commerce to adjust "United States Price" ("USP") for countervailing duties arrived at in final results of the 1988 countervailing duty ("CVD") review when such results have been appealed and an order suspending liquidation has been issued by this Court; and (2) Commerce's methodology adjusting Saha Thai's U.S. price for indirect taxes assessed on home market sales but not on U.S. sales, to include in the tax base certain expenses incurred only on U.S. sales. At oral argument Allied withdrew its challenge to Commerce's tax accounting methodology, hence the Court will not consider this issue. *See Transcript of Tape Recorded Oral Argument,* at 12–13 (Consol.Ct. No. 92–09–00647) (Nov. 3, 1993). Commerce, for its part, argues that it properly concluded that flat bar was not a by-product of steel pipe and tube production, and therefore properly included the value of scrap for a by-product credit. For the reasons set forth below, this Court finds that Commerce has not adequately explained its determination regarding the by-product credit, precluding review of the parties' claims on the merits. As for Allied's challenge regarding countervailing duties, the Court finds that issue to be moot.

### Background

On March 11, 1986, Commerce published an antidumping duty order on certain carbon

steel pipe and tube from Thailand. *Anti-dumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes From Thailand,* 51 Fed.Reg. 8341 (March 11, 1986). Commerce published notice of opportunity to request administrative review of the dumping order in February of 1989. Domestic interested parties requested review of Saha Thai's sales in March of 1989. In responding to Commerce's questionnaires, Saha Thai included calculation of a by-product credit for flat bar in its costs of production for certain circular welded carbon steel pipes and tubes. In June of 1991, Commerce published preliminary results of the antidumping duty order review in which it found a 2.50% weighted-average dumping margin. *Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 26,648 (June 10, 1991) ("*Preliminary Results*"). Domestic parties then filed briefs maintaining that Commerce erred in accepting a by-product credit for flat bar. They argued that the remaining sheet used for production of flat bar should be treated as scrap in determining the cost of production of steel pipe and tube, and that according to Commerce precedent, flat bar cannot be treated as a by-product, citing *Titanium Sponge From Japan: Final Determination of Sales at Less Than Fair Value,* 49 Fed. Reg. 38,687 (Oct. 1, 1984) ("*Titanium Sponge*"). Case Brief For The Domestic Interested Parties, at 2; A.R. 46, R. 1, at Fr. 788–90. Saha Thai replied that the leftover sheet remaining from pipe production and used in flat bar production is substantially different from steel scrap and that Commerce was correct in giving Saha Thai a by-product credit under *Titanium Sponge*. Saha Thai Reply Brief, at 1–5; A.R. 43, R. 1, at Fr. 751–55.

In the interim between preliminary and final results of the 1988–89 antidumping duty administrative review, Commerce issued the final determination of the companion countervailing duty administrative review for the 1988 calendar year in which Thai producers received a 2.86 percent duty rate. *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand, Final Results of Countervailing Duty Administrative Re-*view, 56 Fed.Reg. 50,852 (Oct. 9, 1991) ("*CVD Results*"). Saha Thai appealed the *CVD Results* to this Court in November, 1988. *Saha Thai Steel Pipe Co., Ltd. v. United States,* 17 CIT ——, 828 F.Supp. 57 (1993). A domestic interested party, Wheatland Tube Corporation, also appealed the *CVD Results* in a separate action. *Wheatland Tube Corp. v. United States,* 17 CIT ——, 841 F.Supp. 1222 (1993). On December 23, 1991, this Court granted an order enjoining liquidation of the subject merchandise pending the outcome of the countervailing duty appeals, at Saha Thai's request. *Order,* (Consol. Court No. 92–09–00647) (December 23, 1991).

On August 26, 1992, Commerce published the final results of the 1988–89 antidumping duty administrative review in which it calculated a .45% *ad valorem* weighted-average dumping margin for Saha Thai. *Final Results,* 57 Fed.Reg. at 38,673. This time Commerce denied the by-product credit for flat bar, and instead treated the remaining sheet used in the production of flat bar as scrap and accordingly gave it the value of scrap for the by-product credit. In arriving at the .45% dumping margin, Commerce included the countervailing duty rate of 2.5% arrived at in the companion countervailing duty administrative review. *Final Results,* 57 Fed. Reg. at 38,672. Commerce amended the final results to correct ministerial errors presented by the domestic parties, resulting in a weighted-average dumping margin of .48% *ad valorem*. *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Amendment to Final Results of Antidumping Duty Administrative Review,* 57 Fed. Reg. 48,017 (Oct. 21, 1992).

In this action, Saha Thai moves for judgment on the agency record pursuant to Rule 56.2, arguing that Commerce's denial of a flat bar credit and its subsequent recalculation of coil costs in which a scrap value credit was used is unsupported by substantial evidence or otherwise not in accordance with law. Allied also moves for judgment on the agency record, arguing that Commerce did not act in accordance with law in adjusting USP for countervailing duties which had not yet been imposed. The Court has jurisdiction over

this matter pursuant to 28 U.S.C. § 1581(c) (1988).

### Discussion

 Saha Thai and Allied cite *Titanium Sponge* as precedent for determining whether a certain product should be given by-product or intermediate product status. *Memorandum In Support of Plaintiff's Motion for Judgment Upon The Agency Record* ("*Plaintiff's Memorandum*"), at 10; *Defendant–Intervenor's Memorandum In Opposition to Plaintiff's Motion For Judgment Upon The Agency Record* ("*DI's Memorandum*"), at 5. In that case, Commerce concluded that titanium tetrachloride is an intermediate product because (1) it is manufactured in separate facilities, (2) the quantity of production could be determined by management and is not determined by production of titanium sponge, and (3) production of titanium tetrachloride was not an unavoidable consequence of the manufacturing of titanium sponge. Saha Thai cites *Frozen Concentrated Orange Juice From Brazil; Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 26,721 (June 29, 1990) ("*FCOJ*"), in which Commerce concluded that feed pellets produced from leftover orange rind and pulp when crushing oranges in the production of orange juice are a by-product of the production of orange juice for which a by-product credit may be used in determining the cost of production of orange juice. *Plaintiff's Memorandum,* at 10, 16–17. In addition, Saha Thai cites *Final Determination of Sales at Less Than Fair Value; Fall–Harvested Round White Potatoes From Canada,* 48 Fed.Reg. 51,669 (Nov. 10, 1983) ("*White Potatoes*"), in which Commerce determined that hay and grain crops, grown in fields for the purpose of restoring nutrients to fields used for potato production, are by-products, the sale of which may be credited towards the cost of production of potatoes. *Plaintiff's Memorandum,* at 17.

Saha Thai argues that under the *Titanium Sponge* test, flat bar should be treated as a by-product because (1) it is manufactured in the same facility as steel pipe; (2) the quantity of flat bar is not freely determined by management, nor is it independent of the production of primary product; and (3) it is an unavoidable consequence of producing pipe and tube. *Plaintiff's Memorandum,* at 18–20. Saha Thai further argues that although flat bar requires further processing it is not unlike feed pellets produced from rind and pulp, or hay and grain produced to restore nutrients to fields used in the production of white potatoes. To treat flat bar differently represents a departure from *FCOJ* and *White Potatoes* which must be explained. *Id.* at 20. Lastly, Saha Thai argues that Commerce's treatment of flat bar as an intermediate product while at the same time granting a by-product credit for the value of scrap demonstrates that Commerce is confused. Saha Thai argues that if, in fact, flat bar is an intermediate product, then all costs into flat bar should have been removed from pipe costs, and all revenues from the sale of flat bar should have been removed from cost of production determination for pipe and tube. *Id.* at 21.

Allied argues that flat bar is produced on separate machinery. *DI's Memorandum,* at 5–6. It further argues that the quantity of flat bar is determined by management and that flat bar is not an unavoidable consequence of producing pipe. *Id.* Allied distinguishes flat bar from pulp and rind by arguing that the amount of leftover scrap which is suitable for flat bar production is the result of a management decision, unlike the amount of pulp and rind used in feed pellet production. *Id.* at 10–11. Allied also argues that pulp and rind, as well as grain and hay are different from scrap because they are perishable, which makes further processing of those products unavoidable. *Id.* at 11–12. Lastly, Allied argues that Commerce's treatment of flat bar in this determination is consistent with prior determinations involving by-product questions, but even if Commerce changed its policy in determining by-products, it is entitled to do so. *Id.* at 12–13.

Commerce argues that the criteria used in *Titanium Sponge* and *FCOJ* may be pertinent in determining the nature of a product other than the primary product, but that it has not adopted such criteria as a single test for determining what is a by-product. *Defendant's Memorandum In Opposition to*

*Plaintiff's and Defendant–Intervenor's Motions For Judgment on the Agency Record* (*"Defendant's Memorandum"*), at 14. Commerce argues that it uses a variety of criteria on a case-by-case basis when determining what is a by-product. *Id.* at 15. In this case, Commerce argues that it reached its determination because flat bar is the product of further processing. Commerce states that "[i]mplicit in this conclusion is the finding that flat bar is not an 'unavoidable consequence' of the production of pipe and tube." *Id.* at 16. Commerce argues that the three criteria used in *Titanium Sponge* are not criteria for determining whether a product is a by-product, but are criteria for determining whether a product is an intermediate product, as explained in *FCOJ. Id.* at 15–16. Commerce asserts that even if such three part test existed, Saha Thai is unable to meet two of the three criteria because flat bar production is the result of managerial decisions, and such production is not an unavoidable consequence of the production of pipe and tube. *Id.* at 17–19. Moreover, argues Commerce, leftover scrap from producing pipe and tube is different from leftover pulp and rind from producing orange juice because not all of the leftover scrap from pipe production is used for producing flat bar. All of the pulp and rind, argues Commerce, is suitable to produce feed pellets. *Id.* at 19. Further, steel scrap is different because it has intrinsic value before it is processed, unlike rind and pulp. *Id.*

Commerce's determination is set out as follows:

> **Comment 1:** Petitioners argue that the Department erred in accepting Saha Thai's calculation of production costs, which include revenues from sales of flat bar made from coil scrap. Citing our notice of *Final Determination of Sales at Less Than Fair Value; Titanium Sponge from Japan* (48 FR 38687 [sic]- October 1, 1984), where similar [sic] situation occurred, petitioners claim that revenues from sales of flat bar should be excluded from Saha Thai's production costs because (a) flat bar is not a by-product of the manufacturer of pipe and tube, but rather is an intermediate product, since it is manufactured on separate machinery not used in producing pipe and

tube, (b) the quantity of production of flat bar is decided by management independent from the production of pipe and tube, and (c) the production of flat bar is not an unavoidable consequence of manufacturing pipe and tube (Saha Thai could, like others, simply dispose of the steel scrap on the open market). Petitioners assert, therefore, that the Department should treat the scrap transferred to Saha Thai's flat-bar department as sold to that department and substitute this [sic] revenues from sales of flat bar in Saha Thai's production-cost calculations.

> Saha Thai replies that (a) flat bar is produced on a machine directly adjacent to the slitting machine used in producing pipe and tube, (b) the production of flat bar is determined entirely by the production of pipe and tube, and (c) the excess material used for flat bar is an unavoidable consequence of slitting narrow steel coils for the production of pipe and tube.

> **Department's Position:** We agree with petitioners. Flat bar is not a by-product of the manufacture of pipe and tube; rather, it is the product of further processing of the steel scrap resulting from the manufacture of pipe and tube. Therefore, the revenues from the scrap used in the production of flat bar should not be based on the price of the finished flat bar, but rather on the revenues from the sale of the scrap to unrelated purchasers. We have adjusted Saha Thai's production costs accordingly, substituting for finished flat-bar revenues, the revenues from scrap sales to unrelated purchasers in Saha Thai's production-cost calculations.

*Final Results,* 57 Fed.Reg. at 38,669, (Comment 1).

■ In reviewing Commerce determinations this Court shall hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Before this Court can review the record, it must know what evidence it is looking for. In other words it must know the criteria used, the findings of fact applied to those

criteria, and the conclusions of law arrived at by Commerce in its determination before it can review the record to see whether such criteria, findings, and conclusions are or are not supported by substantial evidence. The role of a court in reviewing administrative decisions was well stated by Justice Marshall of the Supreme Court in *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), in sustaining a district court's holding that an Interstate Commerce Commission ruling was improperly made:

Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions are "not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." As this Court has observed, "The [sic] process of rate making is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems."

The delegation to the Commission is not, of course, unbounded, and it is the duty of a reviewing court to determine whether the course followed by the Commission is consistent with its mandate from Congress. But a simple examination of the order being reviewed is frequently insufficient to reveal the policies that the Commission is pursuing. Thus, this Court has relied on the "simple but fundamental rule of administrative law," that the agency must set forth clearly the grounds on which it acted. For "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." And we must rely on the rationale adopted by the agency if we are to guarantee the integrity of the administrative process. Only in that way may we "guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy."

An agency "may articulate the basis of its order by reference to other decisions." For "[a]djudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein. They generally provide a guide to action that the agency may be expected to take in future cases. Subject to the qualified role of *stare decisis* in the administrative process, they may serve as precedents." This is essentially a corollary of the general rule requiring that the agency explain the policies underlying its action. A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.

There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to. From this presumption flows the agency's duty to explain its departure from prior norms. The agency may flatly repudiate those norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggests that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.

... [I]t is enough to satisfy the requirements of judicial oversight of administrative action if the agency asserts distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing. So long as the policies can be discerned, the court may exercise its proper function of determining whether the agen-

cy's policies are consistent with congressional directives.

*Atchison, T. & S.F.R. Co.*, 412 U.S. at 806–09, 93 S.Ct. at 2374–76 (citations and footnote omitted).

The principles enunciated in the above case by Justice Marshall apply equally to the Department of Commerce in administering the trade laws of the United States, and to this Court in reviewing Commerce determinations. Indeed these principles have been recognized and applied by this Court in reviewing past determinations. *See, e.g. Hussey Copper, Ltd. v. United States*, 17 CIT ——, ——, 834 F.Supp. 413, 419 (1993) (Commerce's failure to adequately articulate departure from traditional methodology in an antidumping duty administrative review warrants remand); *Torrington Co. v. United States*, 15 CIT 456, 461, 772 F.Supp. 1284, 1288 (1991), *aff'd*, 938 F.2d 1276 (Fed.Cir. 1991) (it is in accordance with law when Commerce provides good reason for departing from past practice in a final antidumping determination); *IPSCO, Inc. v. United States*, 12 CIT 384, 389–90, 687 F.Supp. 633, 637–38 (1988), *aff'd in part, rev'd in part*, 965 F.2d 1056 (Fed.Cir.1992) (remand warranted where court is unable to discern criteria used by Commerce in a final antidumping duty determination); *and Kyowa Gas Chemical Industry Co., Ltd. v. United States*, 7 CIT 138, 140–41, 582 F.Supp. 887, 889–90 (1984) (failure of Commerce to consider evidentiary facts and provide findings in light of established criteria in final results of an antidumping duty administrative review precludes judicial review and warrants remand).

In reviewing Commerce's treatment of Saha Thai's cost of production in the present case, this Court must ask whether the criteria Commerce used to make its determination that flat bar is not a by-product are clearly set forth. The Court must then ask if the use of these criteria is consistent with past practice. If so, what facts does Commerce apply to those criteria in arriving at its conclusions? If not, does Commerce clearly provide reasonable grounds for departing from established criteria used in determining the by-product question? If the determination does not clearly set forth the

answers to these questions, it is futile for the Court to examine the record for substantial evidence in support of the determination.

Upon examining Commerce's determination, it is unclear what part of petitioner's argument Commerce is agreeing with. Commerce merely says it agrees with petitioner and then concludes that flat bar is not a by-product, but rather a product of further processing. Does Commerce agree with the criteria used by petitioner or merely the conclusion of the petitioner? If Commerce agrees with the criteria used by the petitioner, what findings of fact has Commerce applied to these criteria to support its conclusion? Commerce argues that the three part test asserted by Saha Thai and Allied does not even exist for the purpose of determining whether a product is a by-product. *Defendant's Memorandum*, at 16–17. Moreover, Commerce argues that *implicit* in its *conclusion* that flat bar is the product of further processing of the steel scrap is the *finding* that flat bar is not an unavoidable consequence of the production of pipe and tube (emphasis added). *Id.*, at 16. Such an argument raises additional questions. First, is Commerce's position that flat bar is the product of further processing a conclusion, finding or criterion? If one, it necessarily cannot be the other. Second, if such a *finding* is implicit, can it at the same time be clearly set forth? Because this determination raises such questions, this Court finds that Commerce has not clearly set forth the basis for its determination. This determination lacks clear criteria and clear findings of fact. As such, it would be futile for this Court to examine the record in search of substantial evidence.

Lastly, this Court has upheld Commerce's final countervailing duty determinations in *Saha Thai Steel Pipe Co., Ltd. v. United States*, 17 CIT ——, 828 F.Supp. 57 (1993), and in *Wheatland Tube Corp. v. United States*, 17 CIT ——, 841 F.Supp. 1222 (1993). These decisions were not appealed and are therefore final. Hence, Allied's request for this Court to remand this case to Commerce to recalculate the antidumping duty rate so as not to include an adjustment for countervailing duties pending final judicial determi-

nation of this case is now moot, and will not be addressed by this Court.

### Conclusion

Accordingly, the *Final Results of Anti-dumping Duty Administrative Review* are remanded to Commerce. In its remand results, Commerce is ordered to clearly set forth the criteria used, a reasonable explanation for any departure from established criteria if necessary, the facts used, and the conclusions reached in light of those criteria and facts. Commerce shall report its remand results to this Court within 60 days from the date of this opinion. The parties shall have 30 days to file comments on Commerce's remand results.

**SO ORDERED.**