Slip Op. 08-68

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                :
ZHEJIANG NATIVE PRODUCE AND     :
ANIMAL BY-PRODUCTS IMPORT &     :
EXPORT GROUP CORP., JIANGSU     :
KANGHONG NATURAL HEALTHFOODS    :
CO., LTD., AND ANHUI HONGHUI    :
FOODSTUFF (GROUP) CO., LTD.,    :
                                :  Before: Richard K. Eaton, Judge
                                :
                                :  Court No. 06-00234
          Plaintiffs,           :
                                :
     v.                         :
                                :
                                :
UNITED STATES,                  :
                                :
          Defendant,            :
                                :
     and                        :
                                :
THE AMERICAN HONEY PRODUCERS    :
ASSOCIATION AND THE SIOUX       :
HONEY ASSOCIATION,              :
                                :
          Def.-Ints.            :
_____ :
```

OPINION

[The final results of United States Department of Commerce
sustained in part and remanded.]

Dated:  June 16, 2008

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell*, *Ned H. Marshak, Paul G. Figueroa*), for plaintiffs.

*Gregory A. Katsas*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, United States Department of Justice Commercial Litigation Branch, Civil Division,(*Jane Chang Dempsey*); Office of the Chief Counsel for Import Administration, United States Department of Commerce, (*Mildred Stewart*), of counsel, for defendant.

*Kelley Drye Collier Shannon* (*Michael J. Coursey*, *R. Alan Luberda*), for defendant-intervenors.

Eaton, Judge: This matter is before the court on the motion for judgment upon the agency record of plaintiffs Zhejiang Native Produce and Animal By-Products Import & Export Group Corp., Jiangsu Kanghong Natural Healthfoods Co., Ltd., and Anhui Honghui Foodstuff (Group) Co., Ltd. (collectively, "plaintiffs"). *See* Pls.' Mem. Supp. R. 56.2 Mot. J. Agency R. ("Pls.' Mem."). Defendant the United States and defendant-intervenors the American Honey Producers Association and the Sioux Honey Association oppose the motion. *See* Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Opp'n"); Def.-Ints.' Br. Opp'n Pls.' Mot. J. Agency R. ("Def.-Ints.' Opp'n").

By their motion, plaintiffs challenge the final results of the United States Department of Commerce's ("Commerce" or the "Department") third administrative review of the antidumping duty order on honey from the People's Republic of China ("PRC") for the period of review ("POR") beginning on December 1, 2003, and ending on November 30, 2004. *See* Honey from the PRC, 71 Fed. Reg. 34,893 (Dep't of Commerce June 16, 2006) (final results) and the accompanying Issues and Decision Memorandum (Dep't of Commerce June 9, 2006), Administrative Record ("AR") 265 ("Issues & Dec. Mem.") (collectively, "Final Results"). Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C.

§ 1516a(a)(2)(B)(iii).

Certain of the issues in this action have been litigated previously in this Court.[1]  For the reasons set forth below, the court grants, in part, and denies, in part, plaintiffs' motion and remands certain of the Final Results to Commerce.

STANDARD OF REVIEW

The court reviews the Final Results under the substantial evidence and in accordance with law standard set forth in 19 U.S.C. § 1516a(b)(1)(B)(i). ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

---

[1]    These include:  a challenge to Commerce's second administrative review of the antidumping duty order on Chinese honey (for the period of review from December 1, 2002 through November 30, 2003) in *Shanghai Eswell Enter. Co. v. United States*, 31 CIT __, Slip Op. 07-138 (Sept. 13, 2007) (not reported in the Federal Supplement) and in *Wuhan Bee Healthy Co., Ltd. v. United States*, 31 CIT __, Slip Op. 07-113 (July 20, 2007)(not reported in the Federal Supplement); and a challenge to Commerce's first administrative review of the antidumping duty order on Chinese honey (for the period of review from December 1, 2001 through May 31, 2002) in *Wuhan Bee Healthy Co., Ltd. v. United States*, 29 CIT 587, 374 F. Supp. 2d 1299 (2005).

It "requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quotations and citations omitted).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The possibility of drawing two equally justifiable, yet inconsistent conclusions from the record does not prevent the agency's determination from being supported by substantial evidence.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966);  *Altx, Inc.*, 370 F.3d at 1116.

Moreover, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ("*Ceramica*").

DISCUSSION

I.   Legal Framework for Calculating Surrogate Values

     In determining whether the subject merchandise is being, or

is likely to be, sold at less than fair value, 19 U.S.C.

§ 1677b(a) requires Commerce to make "a fair comparison . . .

between the export price[2] or constructed export price[3] and normal

value."   When merchandise that is the subject of an antidumping

investigation is exported from a nonmarket economy ("NME")[4]

country, such as the PRC, Commerce, under most circumstances,

determines normal value by valuing the factors of production used

---

     [2]      The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted.  19
U.S.C. § 1677a(a).

     [3]      "Constructed export price" is "the price at which the
subject merchandise is first sold . . . in the United
States . . . by or for the account of the producer or exporter of
such merchandise or by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with the producer or
exporter," as adjusted.  19 U.S.C. § 1677a(b).

     [4]      A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).  Therefore, because the
subject merchandise comes from the PRC, Commerce constructed
normal value by valuing the factors of production using surrogate
data from India.  *See* 19 U.S.C. § 1677b(c)(4).

in producing the merchandise using surrogate data, to which it

adds

> an amount for general expenses and profit
> plus the cost of containers, coverings, and
> other expenses. . . .[T]he valuation of the
> factors of production shall be based on the
> best available information regarding the
> values of such factors in a market economy
> country or countries considered to be
> appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1).


A.    Calculation of Surrogate Value of Raw Honey

     In choosing surrogate values, Commerce is directed to meet

the "best available information" standard.  19 U.S.C.

§ 1677b(c)(1).  Commerce has stated that it considers several

factors, "including quality, specificity, and contemporaneity of

the source information" in seeking to meet the standard.  Issues

& Dec. Mem. at 10.  The Department prefers "whenever possible, to

use countrywide data, and only resorts to company-specific (or

regional) information when countrywide data are not available.

In addition, the Department prefers to rely on publicly available

data."  *Id*. at 11.  Prior cases have upheld this methodology to

find the best available information.  *See, e.g.*, *Wuhan Bee

Healthy Co. v. United States*, 31 CIT at __, Slip Op. 07-113 at 28

(July 20, 2007) (not reported in the Federal Supplement) ("*Wuhan

II*").

     Commerce calculated the surrogate value of raw honey using

data from the website of EDA Rural Systems Pvt. Ltd. ("EDA"),[5]

which Commerce adjusted for inflation for the purported purpose

of making the data contemporaneous to the POR.  Issues & Dec.

Mem. at 10.  Plaintiffs argue that Commerce's selection of data

to calculate surrogate value was not supported by substantial

evidence in the record.

In its Final Results, Commerce found that the adjusted EDA

data constituted the best available information on the record.

"In selecting the EDA data, the Department finds that these raw

honey pricing data are the best information currently available

because they are publicly available, quality data, and specific

to the raw honey beekeeping industry in India."  Issues & Dec.

Mem. at 11.

> We note that the EDA data are from a
> published, publicly available source, the
> website, www.litchihoney.com.  With respect
> to quality, we find that the EDA data source
> is highly documented, including numerous
> specific price points over a six-year period
> for multiple types of honey from many
> suppliers, and includes detailed information
> on production, inputs, and beekeepers.
> Regarding specificity, we note that the
> prices quoted in the EDA data are specific to
> the raw honey beekeeping industry in the
> state of Bihar in India, which the Department
> found to be a significant producer of honey
> in India.  Regarding reliability, the

---

[5]   "[T]he EDA data are from a published, publicly available source, the website, www.litchihoney.com."  Issues & Dec. Mem. at 11.  The website is maintained by EDA Rural Systems Pvt. Ltd., "an organization that provides business development services to the honey and beekeeping sector in India."  *Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 26.

> Department finds that the data collection
> methods for the EDA data are documented with
> respect to data sources, distribution, and
> collection practice.

Issues & Dec. Mem. at 11 (citations omitted).

Plaintiffs contend that, rather than using the EDA data,
Commerce should have calculated the price of raw honey based on
an average of the prices derived from three news articles found
in Indian publications, i.e., the *Tribune of India* ("*Tribune*"),
*Business Line Internet Edition* ("*Money*"), and *Hindu Online*
("*Sunderbans*").  Plaintiffs insist that, had Commerce used their
preferred evidence, Commerce would have found that the price of
raw honey declined during the POR and that the price of raw honey
was substantially lower than Commerce found.  *See* Pls.' Mem. 2.

    1.  Evidence Regarding Price Decline

Plaintiffs first argue that Commerce erred by adjusting the
EDA data upward to account for inflation when there was
"overwhelming evidence on the record confirming that raw and
processed honey prices in India declined during 2004 (POR 3) from
their peak in mid-year 2003."  Pls.' Mem. 14.  Plaintiffs argue
that Commerce ignored record evidence of a price decline,
primarily by not taking into account the *Tribune*, *Money*, and
*Sunderbans* articles.  *See* Pls.' Mem. 15-16.  Specifically, they
contend that data from these articles show that raw honey prices
were significantly lower in this administrative review (December

1, 2003 through November 30, 2004) than in the second
administrative review (December 1, 2002 through November 30,
2003), and lower in the second half of the third POR (June 2004
through November 2004) than in the first half of that period
(December 1, 2003 through May 2004).  Pls.' Mem. 15-16.

At the administrative level, Commerce determined that none
of plaintiffs' proposed sources contained data as "reliable or
appropriate" as the EDA data.  Issues & Dec. Mem. at 12.  As a
result, Commerce found that plaintiffs had not shown evidence of
a price decline.  *See* Issues & Dec. Mem. at 12.

First, Commerce addressed the *Tribune* article, dated
December 15, 2003, which states a price for raw honey at 65
rupees per kilogram in 2003:

> As an initial matter, we note that the
> Tribune article may represent data from a
> state only slightly larger than that
> represented by the EDA data, and therefore
> the EDA data are as representative as the
> prices in the Tribune article.  However, the
> Department also finds that the EDA data are
> more detailed in that they contain multiple
> price points over discrete periods of time
> for specific types of honey and contain
> exhaustive information on the source of these
> data.  The Department determines for these
> final results that the EDA data are a more
> reliable source to value raw honey because
> the Department finds that the data collection
> methods for the EDA data are documented with
> respect to data sources, distribution, and
> collection practice.

Issues & Dec. Mem. at 13-14.

Commerce also reviewed the other two articles.  The

*Sunderbans* article, dated March 5, 2004, valued raw honey at 40 rupees per kilogram and the *Money* article, dated January 26, 2004, valued it at 50 rupees per kilogram.  Issues & Dec. Mem. at 4.  Commerce found that, unlike the EDA data which pertains to the second-largest honey producing state in India, "the exceptionally limited nature of the Sunderbans and Money articles' data renders them unrepresentative of Indian prices as a whole in comparison with the broader EDA data."  Issues & Dec. Mem. at 14.  Commerce stated,

> [T]he Department deemed the Money article not representative of prices in India, because the data reported by the article are from a single honey processing society, the Chandram Honey Producers Society.  According to the article, the society sold 3,000 kg of honey in the previous year (2003).  The same concerns hold for the Sunderbans article, which was placed on the record after the *Preliminary Results*.  The Sunderbans article refers to prices in a single region of India, West Bengal, not alleged to be a major honey producing state.

Issues & Dec. Mem. at 13.  The Department concluded: "In light of the various price points on the record, the Department cannot agree with respondents that record evidence makes it self-evident that the Indian honey market suffered a significant price decline during the POR."  Issues & Dec. Mem. at 12.

The court finds that Commerce did not act unreasonably in finding the EDA data to be more reliable.  A review of the record reveals that the EDA data are more detailed and more reliable

than the news articles plaintiffs placed on the record.[6]  For

instance, the EDA data do include "numerous specific price points

over a six-year period for multiple types of honey from many

suppliers," include "detailed information on production, inputs,

and beekeepers," and the data collection methods "are documented

with respect to data sources, distribution, and collection

practice."  *See* Issues & Dec. Mem. at 11.  Thus, Commerce was

justified in finding that the *Tribune* article was not "unusable

as a source for valuing raw honey," and that the EDA data are the

"best available information" because they are more detailed and

more reliable than the data in the *Tribune* article, and because

the EDA data contain many price points over discrete periods of

time for specific types of honey and contain detailed information

on the source of these data.  Issues & Dec. Mem. at 13-14.

Further, unlike the EDA data, the *Sunderbans* and *Money*

articles were not as representative of prices in India because

the prices were from a single honey processing society (in the

---

[6]     Plaintiffs also urged the court to review the Factors
of Production Valuation Memorandum for the fourth period of
review (for the period December 1, 2004 through November 30,
2005), in which, plaintiffs claim, "the Department expressly
acknowledged that raw honey prices in India experienced a 'steady
decline through 2004 and the first five months of 2005.'" Pls.'
Mem. 16 and n. 12 (footnote omitted).  This Memorandum is not
part of the record in this action.  *Id*. at 16, n. 12. Non-record
evidence regarding a price decline put forth by plaintiffs in
this way cannot properly be considered as a supplement to the
record.  *See Hynix Semiconductor Inc. v. United States*, 26 CIT
1154, 1154, Slip Op. 02-117 at 3 (Sept. 30, 2002) (not reported
in Federal Supplement).

*Money* article) or from a single region of India that is not a major honey producing state (in the *Sunderbans* article).  Issues & Dec. Mem. at 13.  The EDA data, on the other hand, are more representative of country-wide prices because they come from a large honey producing state.  Issues & Dec. Mem. at 12.  Given the evidence on the record, Commerce reasonably relied on the EDA data, which does not reveal a price decline during the POR.  Plaintiffs have thus failed to meet their burden to put forth evidence demonstrating a price decline.  *See Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 937, 806 F. Supp. 1008, 1015 (1992).

Plaintiffs next contend that the price of honey derived from the EDA data is not supported by substantial evidence because there was other, more contemporaneous evidence on the record.  Plaintiffs argue that the EDA data (which cover sales from December 2002 through June 2003) are entirely outside the period of review (December 1, 2003 through November 30, 2004), and are based solely on prices from the first half of 2003 (five months prior to the beginning of the third period of review) when honey prices reached their peak.  Pls.' Mem. 19.  Accordingly, plaintiffs insist that the EDA data "do not reflect the honey market conditions in India during [the] POR," and that, because the record contains "reliable, contemporaneous, publicly available surrogate prices for raw honey, the Department

committed a reversible error in relying on stale surrogate data . . . ." Pls.' Mem. 19-20.

Commerce states in response that contemporaneousness is but one factor it considers, and where the alternate data is not exactly contemporaneous with the POR, the factor of contemporaneousness does not carry as much weight. *See* Def.'s Opp'n 17 (quoting *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 301, 366 F. Supp. 2d 1264, 1275 (2005) ("*Hebei II*")).

The court finds that plaintiffs have failed to show that the price derived from the EDA data is not supported by substantial evidence. The EDA data are taken from a six-month period beginning a year prior to the period of review. The pricing data's distance from the period of review is, however, not outweighed by plaintiffs' alternative data, which itself is not entirely contemporaneous with the period of review. *See Hebei II*, 29 CIT at 301, 366 F. Supp. 2d at 1275. ("While the contemporaneity of data is one factor to be considered by Commerce, three months of contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the [period of investigation ("POI")].") (citation omitted). That is, the *Tribune* and *Money* articles provide data for 2003 but only the month of December 2003 is within the period of review. For their part, plaintiffs have not shown that their

proposed data is superior to the EDA data in other respects.  As the court has discussed, the EDA data have many more price points and relate to a state that is a significant honey producer. Plaintiffs' data, on the other hand, are not as representative, are less detailed, have fewer price points, and are less well-documented.  Therefore, the court agrees with Commerce that the EDA data are the best available information as the EDA data are "publicly available, quality data, and specific to the raw honey beekeeping industry in India."  Issues & Dec. Mem. at 11. Therefore, while the evidence offered by plaintiffs may be more contemporaneous than the EDA data, it cannot be said that Commerce unreasonably found that that factor alone was not determinative.  Thus, the court finds that Commerce's decision that the EDA data were the best available information is supported by substantial evidence.

   2.  Plaintiffs' Proposed Benchmark

   Plaintiffs also claim that the use of the EDA data is unsupported by substantial evidence because it results in values for raw honey that are higher than the average export price of processed honey.  Pls.' Mem. 9-10.  Plaintiffs rely on a "benchmark price" for exported honey (based upon data from World Trade Atlas and India Infodrive)[7] to compare Commerce's

_____

   [7]   These sources compile and disseminate official import statistics.

calculated surrogate values for raw honey to the average export
prices for processed honey.  According to plaintiffs, this
comparison demonstrates that raw honey costs based on the EDA
data are artificially high.  Plaintiffs insist that this
comparison is valid because it is "unlikely that Indian exporters
would sell honey below the costs incurred by middlemen purchasing
raw honey as an input."  Def.'s Opp'n 13.  In other words,
plaintiffs argue that the Final Results are "anomalous" because
the normal value calculated using the EDA Data is higher than
their proposed benchmark for exported honey prices.

     With respect to plaintiffs' argument for use of a benchmark,
Commerce found that "export data may not accurately reflect the
market value of the goods within the country of exportation.  The
Department's stated preference is not to use export data." Issues
& Dec. Mem. at 12 (citations omitted).  "[E]xport prices may be
driven not by the cost of production or market pricing in the
exporting country, but by the prices or other market factors in
the countries to which the product was exported."  Def.-Ints.'
Opp'n 11.  As a result, for Commerce, plaintiffs' proposed
benchmark comparison does not necessarily demonstrate that export
prices move in tandem with domestic prices in a way that would be
useful in its analysis.  Moreover, Commerce stated:

> [T]he WTA data and Infodrive data rely on
> values under [Harmonized Tariff Schedule] HTS
> subheading 04900000, which is a basket
> category composed of both raw and processed
> honey shipments.  The Department does not use

> data based on this subheading to value raw honey precisely because it is a basket category.  The Department has also indicated in prior cases that it prefers not to use Infodrive data to derive surrogate values or to use as a benchmark to evaluate other potential surrogate values because it does not account for all of the imports that fall under a particular HTS subheading.

Issues & Dec. Mem. at 12. (footnote and quotation omitted).

Commerce has at least some discretion in deciding what is the best available information.  *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 666-667, 387 F. Supp. 2d 1236, 1245-46 (2005) ("*Hangzhou*"); *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999)("*Shakeproof*")("The statute requires Commerce to use the best available information, but does not define that term . . . . If Congress had desired to restrict the material on which Commerce could rely, it would have defined the best available information.") (footnote and citation omitted).  This Court's role is to evaluate whether Commerce's choice of information is reasonable.  *Hangzhou*, 29 CIT at 667, 387 F. Supp. 2d at 1246.

Commerce found the EDA data to be the best available information, and plaintiffs' "benchmark" argument has not shown that Commerce's choice was unreasonable.  It might seem odd that the price of honey used by the Department should exceed plaintiffs' benchmark.  However, plaintiffs have failed to show

how their benchmark, based on export prices, is a useful

comparison with domestic prices, because they have failed to

demonstrate that the benchmark price bears any relationship to

the domestic price.  For example, plaintiffs have made no effort

to show that the market factors affecting domestic prices are the

same for export prices.  Nor have plaintiffs shown that there is

a correlation between the domestic and export prices for honey.

Thus, the proposed benchmark, standing alone, fails to provide

convincing evidence that Commerce's selection of the EDA data as

the best surrogate value source was unreasonable.

B.    Selection of Data Source for Calculation of Surrogate
      Financial Ratios

      Title 19 U.S.C. § 1677b (c)(1)(B) requires that the

calculation of normal value include amounts for "general expenses

and profit."  Accordingly, Commerce "usually calculates" separate

values for: selling, general and administrative ("SG&A")

expenses; manufacturing overhead; and profit, using ratios

derived from financial statements of companies that produce

identical or comparable merchandise in the surrogate country.

*Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 41-42 (citation and

quotation omitted).

      Here, Commerce determined that the information from the

2004-2005 financial statements of the Mahabaleshwar Honey

Producers' Cooperative ("MHPC") was "the best and most

contemporaneous available information for valuing the financial

ratios." Issues & Dec. Mem. at 19 (footnote omitted).  Commerce

states that it chose the MHPC financial statements because they

contain a chairman/president's report, auditor's notes, and

itemized costs associated with honey production and sales,

specifically separating MHPC's honey production and sales from

MHPC's other business functions. Issues & Dec. Mem. at 19.

Plaintiffs argue that Commerce's use of MHPC financial

statements, rather than those of Apis (India) Natural Products

("Apis") caused the results to be unsupported by substantial

evidence and not in accordance with law.  The court has

previously addressed two of plaintiffs' specific arguments in

*Wuhan II* and in *Shanghai Eswell Enter. Co. v. United States*, 31

CIT __, Slip Op. 07-138 (Sept. 13, 2007) (not reported in the

Federal Supplement) ("*Shanghai Eswell*") where it sustained

Commerce's decision to rely on the MHPC financials rather than

Apis's:

> The court finds that Commerce was justified
> in determining that the 2003-2004 MHPC
> financial statement[8] was the best available
> information to value factory overhead, SG&A
> expenses and profit.  It is apparent from the
> Final Results that Commerce examined both the
> MHPC and Apis financial statements and
> compared their quality, specificity and

---

[8]     The issues in this litigation are substantially the
same although here Commerce relied on the 2004-2005 MHPC
financial statements for the Final Results, not the 2003-2004
MHPC financial statements at issue in previous cases. *See* Issues
& Dec. Mem. at 19.

contemporaneity.  It then concluded based on this examination that "the Apis financial statement . . . is not a reliable source for calculating the surrogate financial ratios because it is neither complete, nor sufficiently detailed to provide a reliable source for surrogate values."  As Commerce observed, the "Apis statement does not include any auditor notes, nor does it appear to include complete schedules or details on Apis' operations."  The MHPC's statement, on the other hand, "include[s] a complete annual report, and auditors report, and complete profit and loss and business statement that segregate MHPC's honey and fruit canning businesses."  Unlike Apis's statement, MHPC's statement details its honey operations with both narrative text and schedules indicating, for example, the number of kilograms of honey produced by particular MHPC members and the price per kilogram.  The court thus finds that Commerce's determination that the MHPC financial statement was the best available information to value financial ratios was reasonable.

*Shanghai Eswell*, 31 CIT at __, Slip Op. 07-138 at 11-12 *(*quoting *Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 47-48 (citations omitted)).

Although the MHPC and Apis financial statements at issue here are for different years than those in previous cases and thus contain different numbers, their form and presentation are the same.  Because the plaintiffs present identical arguments here, as in previous cases, the court follows the holdings in *Shanghai Eswell* and *Wuhan II* that the MHPC financial statements constitute the best available information.[9]  *See* 19 U.S.C.

---

[9]    The period of review was different in this POR (December 1, 2003 through November 30, 2004) than in *Shanghai*

§ 1677b (c)(1).

In addition, the court in *Shanghai Eswell* rejected two other arguments identical to those presented here, that: MHPC as a cooperative is not a "true market economy entity"; and, that its financial statements are tainted by expenses related to non-subject merchandise.  Pls.' Mem. 27, 35, 37.  As in *Shanghai Eswell*, the court finds that "the Final Results demonstrate that Commerce took into consideration MHPC's status as a cooperative when making its determination that its financial statement was more reliable than Apis's financial statement."  *Shanghai Eswell*, 31 CIT __, Slip Op. 07-138 at 13.  The *Shanghai Eswell* Court found no evidence that MHPC's status as a cooperative rendered its financial statement unreliable: "[a]n examination of the record demonstrates that, other than certain unpaid loans, plaintiffs can rely on no record evidence to support their claim [that MHPC's financial data are distorted by non-market forces]." *Id*. at __, Slip Op. 07-138 at 13.  In *Shanghai Eswell*, as here: "Without supporting with record evidence their claim that unpaid, personal loans made by MHPC to its members actually affected MHPC's financial statement, plaintiffs' generalized statement does not undermine Commerce's finding that MHPC's status as a

---

*Eswell* and *Wuhan II* (December 1, 2002 through November 30, 2003), but the issues are substantially the same.  *See Shanghai Eswell*, 31 CIT __, Slip Op. 07-138 at 2; *Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 1300.

cooperative did not render its financial statement unreliable."

*Id.* at __, Slip Op. 07-138 at 14.

Plaintiffs also claim that MHPC's financial statement was distorted by its fruit canning division because "there is not a clear division of costs between MHPC's honey and fruit canning operations in some of the schedules used by the Department," and that some expenses in the Department's calculations, such as bank interest, travel expenses, building appreciation and depreciation, included expenses for both the honey and the fruit canning divisions. Pls.' Mem. 38. The *Shanghai Eswell* Court addressed this issue, finding that plaintiffs failed to demonstrate that Commerce ignored evidence that the MHPC financial statement was distorted by its fruit canning division:

> [W]hile acknowledging that MHPC produced non-subject merchandise in addition to the subject honey, Commerce found that MHPC's financial statement sufficiently distinguished the costs associated with the honey and fruit canning divisions such that Commerce could derive surrogate financial ratios based solely on honey data.

*Shanghai Eswell*, 31 CIT at __, Slip Op. 07-138 at 14-15. Commerce specifically found that "the asset value of non-subject operations accounts for only a minor portion of MHPC's total asset value." Issues & Dec. Mem. at 20. Moreover, "Commerce calculated a profit only from the honey processing division." Def.'s Opp'n 23. The *Shanghai Eswell* Court then found that its examination of the MHPC financials confirmed the Department's

findings.  *Shanghai Eswell*, 31 CIT at __, Slip Op. 07-138 at 16.

Because plaintiffs present nothing new with respect to their arguments, the court follows the holdings in *Shanghai Eswell* that the plaintiffs have not demonstrated that the MHPC financial statements were unreliable, either because of MHPC's status as a cooperative or because of expenses related to non-subject merchandise.

In addition to those made in previous cases, plaintiffs present two arguments not previously litigated in an effort to demonstrate that the MHPC financials were unreliable.  First, plaintiffs complain that the MHPC financials lacked a raw material cost for honey, resulting in Commerce having to extrapolate the raw material cost.  Pls.' Mem. 33.  Plaintiffs argue that, by doing so, the determination relied on "unsupported assumptions."  Pls.' Mem. 33-34.

In answer to plaintiffs' claims, Commerce states that

> the MHPC financial statements provide
> adequate information to approximate the cost
> of goods sold, based on the reported amounts
> of "honey collected" and "honey sold."
> Contrary to respondents' assertions, the
> necessity of making certain assumptions in
> ascertaining the cost of raw honey consumed
> and the subsequent profit calculation do not
> make the data unusable.

Issues & Dec. Mem. at 19-20 (footnote omitted).  That is, Commerce insists that it was able to calculate an accurate raw material cost as follows: "(total cost of honey

purchases/quantity purchased) x (sum of the quantities sold &

lost during production)."[10]  Factors of Production Valuation Mem.

for the Preliminary Results and Partial Rescission of Antidumping

Duty Admin. Review of Honey from the PRC dated December 9, 2005,

AR 229, Att. 12.[11]  Commerce found "that the current calculation

methodology provides for a reasonable derivation of the cost of

goods sold and profit ratio." Issues & Dec. Mem. at 20.

Although plaintiffs insist that Commerce relied on

unwarranted assumptions in its calculation of raw material costs,

they identify nothing that would lead the court to agree with

them.  While the MHPC financials lack a raw material cost, they

do contain amounts for "honey collected" and "honey sold."

Plaintiffs make no argument that these amounts are not accurate.

Therefore, Commerce's straightforward calculation does indeed

---

[10]    Plaintiffs also argue that it is Commerce's practice to
"reject a surrogate producer's financial statement which does not
permit a calculation of the raw materials costs."  Pls.' Mem. 33
(citing Certain Preserved Mushrooms from the PRC, 63 Fed. Reg.
72,255, 72,265 (Dep't of Commerce Dec. 31, 1998) (notice)
("*Mushrooms*")).  *Mushrooms*, however, is inapposite, because in
that decision, unlike the present case, the needed data was
difficult to isolate in the financials.  *Mushrooms*, 63 Fed. Reg.
at 72,265 ("The packing material amount is almost as large as the
raw materials amount.  The raw materials schedule does not
include cans or jars in the listing of the major raw materials.
Accordingly, we have made the reasonable assumption that
Saptarishi Agro included the costs of containers in the packing
materials amount, and we are unable to break out this amount
further.").

[11]    The Department did not change this method of
calculation in the Final Results.  *See* Factors of Production
Valuation Memorandum for the Final Results of Antidumping Duty
Admin. Review of Honey from the PRC dated June 9, 2006, AR 266.

seem to be a reasonable method of approximating the cost of goods
sold.  Because Commerce has demonstrated that the MHPC financial
statements are equal to or superior to those of Apis in most
material respects (i.e., they are more complete, more detailed,
and more reliable), and because the Department has shown that it
can make a reasonable calculation of the cost of honey, the court
sustains its cost of goods sold calculation.

Finally, plaintiffs complain that MHPC, as a cooperative, is
not required to comply with Indian Generally Accepted Accounting
Principles ("GAAP") requirements and thus that its financial
statements cannot be certain to conform to Indian GAAP.  Pls.'
Mem. 37.  As noted above, the court previously addressed the
argument that, as a cooperative, MHPC is not a true market entity
such that its financial statements could not be reliable.

In response to the argument regarding Indian GAAP, Commerce
stated:

> . . . the Department finds that the
> respondents' claim that the Apis financial
> statements comport with Indian GAAP, while
> MHPC's does not, is based on the respondents'
> assessment rather than an auditor's official
> certification and we therefore accord it
> little weight, especially given the Court's
> acceptance of the Department's reliance on
> MHPC in prior reviews.

Issues & Dec. Mem. at 20 (citation omitted).  In fact, plaintiffs
cite to no evidence on the record demonstrating that the MHPC
financials do not comply with Indian GAAP.  Moreover, they fail
to demonstrate how Indian GAAP reporting differs from the method

used in compiling the MHPC financials.  Because plaintiffs have pointed to no record evidence that: (1) the MHPC financials were not kept in accordance with Indian GAAP; or (2) that, even if the MHPC financials were not kept in accordance with Indian GAAP, how they would be less reliable than those of Apis, the court cannot credit plaintiffs' argument.

Plaintiffs have failed to show that the Apis financial statement was more reliable than that of MHPC, and as a result have failed to make the case that the MHPC statement is not the best information available.  *See* 19 U.S.C. § 1677b (c)(1).  Therefore, it cannot be said that Commerce's choice to rely on the MHPC financial statement is unsupported by substantial evidence or not in accordance with law.  *See Ceramica*, 10 CIT at 404-405, 636 F. Supp. at 966.  The court sustains Commerce's choice.

C.    Calculation of the Surrogate Financial Ratios

In determining normal value, Commerce uses ratios[12] to

---

[12]    As this Court has explained:

> [t]o calculate the SG&A ratio, the Commerce practice is to divide a surrogate company's SG&A costs by its total cost of manufacturing.  For the manufacturing overhead ratio, Commerce typically divides total manufacturing overhead expenses by total direct manufacturing expenses. Finally, to determine a surrogate ratio for

(continued...)

calculate amounts for "general expenses and profit," calculating

separate values for SG&A expenses; manufacturing overhead; and

profit.  *See Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 41-42

(citation and quotation omitted).


1.    Calculation on a LIFO Versus FIFO Basis

To determine the denominator in the financial ratios,

Commerce must use a closing value for inventory, an element in

calculating the cost of materials consumed.  As addressed above,

plaintiffs have taken issue with the Department's reliance on the

MHPC financial statements, in part because they did not include a

raw material cost for honey.  "As a result, the Department

assumed that MHPC has no ending inventory at all and imposed a

'last in, first out' ("LIFO") valuation of MHPC's raw materials,

by valuing all production using current honey purchases without

regard to the value of raw materials in beginning stock."  Pls.'

Mem. 40.  Plaintiffs claim that a LIFO method of valuing

---

[12](...continued)
     profit, Commerce divides before-tax profit by
     the sum of direct expenses, manufacturing
     overhead and SG&A expenses.  These ratios are
     converted to percentages ("rates") and
     multiplied by the surrogate values assigned
     by Commerce for the direct expenses,
     manufacturing overhead and SG&A expenses.

*Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 42 n. 15, (citing
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
482, 318 F. Supp. 2d 1339, 1341 (2004)).

inventory "does not make sense in the case of an input such as honey, where there would be an incentive to use the oldest raw material first."  Pls.' Mem. 40.  Plaintiffs contend that honey is perishable, meaning that its value would decrease over time, necessitating the use of a first-in-first-out ("FIFO") methodology.

Commerce rejected plaintiffs' claim that it should use a FIFO approach to "calculate the cost of goods sold on the basis that honey is a perishable product."  Issues & Dec. Mem. at 22.  In doing so the Department stated, "Respondents have provided no evidence to support their claim that honey is perishable; thus, the Department finds no reason to alter its inventory valuation methodology, which was applied in the *Preliminary Results* and previous segments of this order."  Issues & Dec. Mem. at 22.

While it may seem obvious that honey is perishable, the discussion at oral argument made clear that there is considerable dispute over how long it can be stored.[13]  What is clear, though, is that there is nothing on the record indicating how long raw honey can be kept in inventory.  That being the case, any conclusion with respect to plaintiffs' claims would be speculation.  Commerce's determination must be based on record evidence and not speculation.  *See Anshan Iron & Steel Co. v.*

---

[13]    *See generally* Transcript of Oral Argument, Court No. 06-00234 (Nov. 29, 2007).

*United States*, 28 CIT 1728, 1734, n. 2, 358 F. Supp. 2d 1236, 1241, n. 2 (2004) ("Speculation is not support for a finding . . . .") (quotation and citation omitted).  Because plaintiffs have not shown by record evidence that Commerce reached the wrong conclusion with respect to ending inventory, it is within Commerce's discretion to use a LIFO methodology to value inventory.  *See Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 49 (quoting *Shakeproof*, 268 F. 3d at 1382 ("The critical question is whether the methodology used by Commerce is based upon the best available information and establishes antidumping margins as accurately as possible.")).  The court thus finds that Commerce was reasonable in applying the LIFO approach.


     2.   Honey Sales Commissions

     Commerce calculated the SG&A surrogate ratio "based on publicly available information in the MHPC financial statement, which included 'honey sale[s] commissions' paid by MHPC to salesman [sic] to sell honey."  Pls.' Mem. 41.  Plaintiffs contend honey sales commissions were "impermissibly double counted because any commissions reported by Respondents, as a matter of law, were deducted from the U.S. sales price."  Pls.' Mem. 41.  According to plaintiffs:

>          In calculating the United States side of the
>          dumping equation, the Department deducts an
>          amount for "commissions" from the Plaintiffs'
>          U.S. sales prices.  In contrast, in

> calculating normal value in the instant
> proceeding, the Department calculated the
> SG&A surrogate ratio based on publicly
> available information in the MHPC financial
> statement, which included "honey sale[s]
> commissions" paid by MHPC to salesman [sic]
> to sell honey.

Pls.' Mem. 41 (citations omitted).  Thus, plaintiffs contend that

Commerce's calculation of the SG&A ratio is contrary to law.

In the Final Results, Commerce rejected this argument,

insisting, "the Department has determined that because sales

commissions represent standard selling expenses, these

commissions should be included in the surrogate SG&A

calculation."  Issues & Dec. Mem. at 23 (citations omitted).[14]

That is, according to the Department, because standard selling

expenses relate to both home market sales and United States

sales, no adjustment need be made for them either to normal value

---

[14]    Standard selling expenses stand in contrast to direct
selling expenses.  Under Commerce's regulations, "direct selling
expenses" include "commissions . . . that result from, and bear a
direct relationship to, the particular sale in question."  19
C.F.R. § 351.410(c) (2008).  In a market economy proceeding,
Commerce is required to make a "circumstances-of-sale" adjustment
to (A) either export price or constructed export price; and (B)
normal value to account for differences in direct selling
expenses incurred in the United States and foreign markets.  *See*
19 U.S.C. § 1677a(d)(1)(A) (providing for the reduction in the
price used to establish constructed export price by the amount of
any commissions for selling the subject merchandise in the United
States); 19 U.S.C. § 1677b(a)(6)(C)(iii) (providing for
adjustment to normal value for differences in circumstances of
sale).  The purpose of the adjustment is to ensure that export
price and normal value are being compared on an "equivalent
basis" when Commerce makes its dumping determination.  *See* Imp.
Admin. Antidumping Manual, Ch. 8 at 16 (Jan. 22, 1998) (available
at http://www.ia.ita.doc.gov).

or constructed export price.

The court cannot accept plaintiffs' argument.  While plaintiffs contend that there has been "double counting" with respect to sales commissions, they have failed to demonstrate that the expenses they describe as "commissions" are direct selling expenses and not the kind of standard selling expenses that are not deducted when calculating the SG&A ratio. Plaintiffs cite to no record evidence to substantiate their claims as to how these "commissions" should be characterized. This failure is fatal to their claims.  Commerce has the discretion to characterize evidence as long as its determination is supported with substantial evidence.  *See Saudi Iron and Steel Co. (Hadeed) v. United States*, 11 CIT 880, 889, 675 F. Supp. 1362, 1371 (1987) (finding substantial evidence supported Commerce's characterization of the transfer of equipment as a lease/purchase rather than as a loan).

Because plaintiffs have not shown that the expenses claimed to be commissions should be treated as being directly related to home market sales, the court upholds Commerce's finding.

### 3.   Jars and Corks

Plaintiffs also argue that in calculating the financial ratios, Commerce improperly "failed to capture all direct materials in the calculation of the denominator [of the Department's financial ratio calculations], particularly jars and

corks for retail-packed honey and honey machine purchases."

Pls.' Mem. 43.[15]  Plaintiffs claim that MHPC sells its processed

honey in jars, meaning that the jars should be considered direct

materials.  Plaintiffs' position is based on: (1) the listing in

MHPC's financial statements of jar and cork expenses along with

its other honey-related expenses (such as honey collection, honey

sales commissions, and honey boxes purchases); (2) a lack of

evidence demonstrating that the jars and corks were used in

MHPC's fruit canning division; and (3) the observation that the

MHPC financial statements do not show purchases of steel drums or

other honey containers.  Pls.' Mem. 43-44.  According to

plaintiffs, "the only reasonable explanation is that MHPC sells

its honey in jars and corks."  Pls.' Mem. 44.

In the Final Results, Commerce stated that MHPC's financial

statements indicate that these items were being purchased and

sold by MHPC, rather than being consumed in the sale of honey:

"Respondents failed to provide evidence that the 'jars and corks'

were consumed as packing[16] in the manner described."  Issues &

---

[15]    In the calculation of surrogate financial ratios, the
denominator should include the expenses of all direct material
costs.  *See* Persulfates from the PRC, 68 Fed. Reg. 6,712 (Dep't
of Commerce Feb. 10, 2003) (notice of final results), and
accompanying Issues and Decision Memorandum, at Comm. 9 (Dep't of
Commerce Feb. 3, 2003).

[16]    The Department refers to "packing" and "packaging"
interchangeably.  It is not clear to the court that the words, as
used in MHPC's financial statements, are necessarily referring to
the same thing.

Dec. Mem. at 23.

> The Department notes that the costs and
> revenues associated with "jars and corks" are
> independently itemized on the MHPC financial
> statements⸺specifically apart from the lines
> [sic] items labeled "honey sales" and
> "packaging."  Without supporting evidence to
> suggest that the items are associated with or
> incorporated into the sale of subject
> merchandise, the Department must treat the
> financial statement line items as they have
> been reported in the MHPC financial
> statement⸺independent of sales and
> packaging.  Thus, consistent with previous
> segments of this order, the Department will
> continue to deduct only those packing
> expenses identified in the line item
> "packing" in the MHPC annual report, and will
> not adjust the surrogate financial statements
> to include the expenses for "jars and corks."

Issues & Dec. Mem. at 23.

Both parties made identical arguments in *Shanghai Eswell*.

*See* 31 CIT at __, Slip Op. 07-138 at 22-26.  After again

reviewing the chart on page 15 of the MHPC financial statement,

which contains the line items in question, and again finding it

nondeterminative, the court finds no reason to deviate from its

finding in *Shanghai Eswell* pertaining to this issue.

> First, the court observes . . . that the
> chart specifically pertains to honey sale and
> collection.  Next, the court notes that the
> chart contains line items for 250 gram, 500
> gram and 1 kilogram jars; 53 millimeter and
> 38 millimeter corks; and honey machines in
> both the "Sale" column and the "Purchase"
> column.  The line item for 100 gram jars
> appears only in the "Sale" column.  The chart
> is therefore ambiguous.  While it is possible
> that MHPC buys and sells jars [with] corks
> that are either empty or filled with
> something other than honey, there is no

> evidence in the MHPC financial statement
> tending to support such a conclusion.
> Without further explanation the court cannot
> accept as adequate Commerce's reliance solely
> on the line items for jars and corks being
> separate from other line items, to support
> its conclusion that they are not direct
> materials associated with finished honey.

*Shanghai Eswell,* 31 CIT __, Slip Op. 07-138 at 24-25 (citations

and footnote omitted); *see also* Pls.' App. 12 at 15 (MHPC Main

Journal Business Statement).  The court thus rejects as

unsupported by substantial evidence Commerce's findings regarding

expenses for jars and corks and remands this question to

Commerce.


D.   Calculation of Labor Costs

The cost of labor is another factor of production used to

determine normal value.  To calculate the labor wage rate in NME

countries, Commerce, pursuant to its regulations, employs a

regression-based analysis using data from multiple countries:

> Commerce treats the wage rate differently
> from all other factors of production[.] [F]or
> labor, Commerce employs regression-based wage
> rates reflective of the observed relationship
> between wages and national income in market
> economy countries . . . . Using this
> regression analysis, Commerce determines the
> relationship between countries' per capita
> Gross National Product [("GNI")][17] and their

---

[17]     While per capita GNP and per capita GNI are not
precisely the same, both courts and the Department use them
interchangeably.  *See Dorbest Ltd. v. United States*, 30 CIT __,
__, 462 F. Supp. 2d 1262, 1291 (2006); Antidumping Methodologies:
(continued...)

wage rates; Commerce approximates the wage
rate of the PRC by using the PRC's GNI as the
variable in the equation that was the result
of the regression.

*Dorbest Ltd. v. United States*, 30 CIT __, __, 462 F. Supp. 2d
1262, 1291 (2006) (citations omitted) ("*Dorbest I*"); *see* 19
C.F.R. § 351.408(c)(3) ("For labor, the Secretary will use
regression-based wage rates reflective of the observed
relationship between wages and national income in market economy
countries.  The Secretary will calculate the wage rate to be
applied in nonmarket economy proceedings each year.  The
calculation will be based on current data, and will be made
available to the public.")

Plaintiffs' primary challenge to the Department's labor rate
calculation is that it is contrary to law because "the
Department's use of a regression analysis based on a group of
market economy countries . . . contradicts the statute's language
that the factors of production be valued using data from
economically comparable countries pursuant to 19 U.S.C.

---

[17](...continued)
Market Economy Inputs, Expected Non-Market Economy Wages, Duty
Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,723
(Dep't of Commerce Oct. 19, 2006) ("The [World Bank] WB defines
GNI per capita as equivalent to gross national product ("GNP")
per capita, which is the dollar value of a country's financial
output of goods and services in a year divided by its
population.") (quotation omitted); Floor-Standing, Metal-Top
Ironing Tables and Certain Parts Thereof from the PRC, 68 Fed.
Reg. 44,040, 44,042 (Dep't of Commerce July 25, 2003) (notice)
(referring to GNI as "the current World Bank term for what was
previously termed "Gross National Product").

§ 1677b(c)[(4)] . . . ."  Pls.' Mem. 45.  Section 1677b(c)(4)

requires that:

> The administering authority, in valuing
> factors of production [to determine normal
> value of the subject merchandise exported
> from a nonmarket economy], shall utilize, to
> the extent possible, the prices or costs of
> factors of production in one or more market
> economy countries that are . . . at a level
> of economic development comparable to that of
> the nonmarket economy country. . . .[18]

Plaintiffs argue that the 2003 labor calculation was "based

on a basket of countries not economically comparable to China."

Pls.' Mem. 46.  Commerce determined that the PRC's wage rate was

$0.97 per hour in contrast to that of India, an economically

comparable country, whose wage rate is $0.23 per hour.  Issues &

Dec. Mem. at 28, 30.

The Department insists that its use of data from a wide

range of market economy countries enhances the "accuracy,

predictability, and stability of the wage rate."  Issues & Dec.

Mem. at 29.

> Due to the variability of wage rates in
> countries with similar per capita GNI, were
> the agency to select a single surrogate
> country, or even a small group of surrogate
> countries, to value labor wage rates, the
> result would vary widely depending upon the
> economically comparable countries selected.
> Thus, the regulations, as implemented,
> provide for a more accurate and more

---

[18]   The statute further states that, to the extent possible, the surrogate countries used to determine the wage rate be "significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4)(B).

> predictable result by utilizing data from
> multiple countries.

Issues & Dec. Mem. at 28 (citations omitted).  In other words, Commerce bases its case on the idea that its regression analysis would yield inaccurate results if it depended only on data from countries that are economically comparable to the PRC.

Commerce's argument seems to refer to the validity of using data from a wide range of market economy countries within the regression model, but does not explain how its regulations,[19] which rely on per capita GNI, rather than surrogate data from market economy countries at a level of development comparable to that of the nonmarket economy, meet the requirements of the antidumping statute.  Issues & Dec. Mem. at 28-29.

Thus, Commerce appears to be side-stepping the issue raised by plaintiffs.  In other words, in valuing all other factors of production, Commerce follows the statute and "prices or costs" the factors of production using values found in surrogate countries that are economically comparable to the NME country under investigation.  Indeed, as has been seen, here Commerce valued raw honey using surrogate data from India.  In its response to the issue raised by plaintiffs, however, the Department attempts to justify the use of data in the methodology

---

[19]    The regulation describes the methodology by which the Department calculates expected NME wages: "For labor, the Secretary will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries."  19 C.F.R. § 351.408(c)(3).

prescribed by its regulations, but not the regulations themselves.  Because Commerce has failed to explain how its regulations comport with the statute, this matter is remanded for the Department to supply that explanation.  "Commerce is obliged to adequately explain how its chosen methodology achieves the required result [of determining antidumping margins as accurately as possible]." *Shandong Huarong Machin. Co. v. United States*, 29 CIT 484, 489, Slip Op. 05-54 at 10 (May 2, 2005) (not reported in Federal Supplement) (citing *NTN Bearing Corp. v. United States*, 14 CIT 623, 634, 747 F. Supp. 726, 736 (1990)).

Plaintiffs also take issue with the implementation of the regulations themselves.  In doing so, plaintiffs challenge the exclusion of data from countries that they claim meet the Department's selection criteria, that is, "all countries for which the requisite data are available."  Issues & Dec. Mem. at 30.  Specifically, plaintiffs cite to the decision in *Dorbest I*, 30 CIT __, __, 462 F. Supp. 2d 1262, and ask that the court issue the same instructions to Commerce in this proceeding, i.e., that on remand, Commerce is to either

> (a) justify why its data set constitutes the best available information; or (b) incorporate those countries meeting its criteria into the data set; and (c) reconsider its use of its methodology or an alternative method for determining the labor rate for the PRC in this case.

Pls.' Mem. 45.  The Department notes that its regression analysis, which does not include "all countries for which the

requisite data are available" is "the same as that used for the

past several years, and is sufficiently robust to conduct a

meaningful regression analysis."  Issues & Dec. Mem. at 30.  To

recalculate the regression analysis with a different basket of

countries would "amount to a significant change" in the current

methodology requiring a public notice and comment process. *Id*.[20]

As this Court held in *Wuhan II*, Commerce errs when it excludes

countries that meet its selection criteria from the data set:

> Commerce's argument that the data set in
> question must be developed through notice-
> and-comment rulemaking appears to be
> inconsistent with Commerce's past practice.
> Commerce has in the past updated and expanded
> the number of countries within the data set
> without resorting to notice and comment
> rulemaking.  In fact, during the
> investigation here, Commerce used a basket of
> fifty-six countries, but during the voluntary
> remand, used a basket of only fifty-four.  No
> notice-and-comment rulemaking was used to
> effect the change.  Commerce has also, over
> time, expanded its data set of countries from
> forty-five countries to fifty-six countries
> without vetting its choices through notice-
> and-comment rulemaking.

*Wuhan II*, 31 CIT at __, Slip Op. 07-113 at 39 (*quoting Dorbest I*,

---

[20]    Commerce did indeed announce a revised methodology in a notice published on October 19, 2006.  *See* Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawbacks; and Request for Comments, 71 Fed. Reg. 61,716, 61,721-23 (Dep't of Commerce Oct. 19, 2006).  Under the revised methodology, the basket of countries "will include data from all market economy countries that meet the criteria described [in the notice] and that have been reported within 1 year prior to the Base Year," which is the most recent reporting year of the data required for the regression methodology.  *Id*. at 61,721-61,722.

30 CIT at \_\_, 462 F. Supp. 2d at 1295).  Indeed, "Commerce has acknowledged . . . the desirability of a broader data set in its own justification for the creation and utilization of a regression model for wage rates . . . ." *Dorbest I*, 30 CIT at \_\_, 462 F. Supp. 2d at 33.  Commerce's explanation that the basket of countries it used "is the same as that used for the past several years," and that recalculating would "amount to a significant change" is insufficient to support its determination.  Commerce has conceded as much by modifying its selection criteria and list of included countries in at least two cases.  *See Wuhan Bee Healthy Co. v. United States*, 32 CIT \_\_, \_\_, Slip Op. 08-61 (May 29, 2008) ("*Wuhan III*"); *Dorbest Ltd. v. United States*, 32 CIT \_\_, \_\_, Slip Op. 08-24 (Feb. 27, 2008) ("*Dorbest II*").  As a result, issues relating to Commerce's selection of data used to calculate labor costs will be remanded.

E.   Calculation of Brokerage and Handling

Finally, plaintiffs contest Commerce's calculation of brokerage and handling value as unsupported by substantial evidence and not in accordance with law.  For the purposes of calculating surrogate values, Commerce "normally values brokerage and handling using nonproprietary information gathered from producers of identical or comparable merchandise in the surrogate country."  Def.'s Opp'n 37 (citing 19 C.F.R. § 351.408(c)(4)).  Commerce selects this data based on its "quality, specificity and

contemporaneity."  Issues & Dec. Mem. at 24-25.

Commerce used a simple average of two surrogate values for domestic brokerage and handling:

> The December 2003 - November 2004 data of Essar Steel (Essar) originally submitted in the anti-dumping administrative review of hot-rolled steel flat products from India (hereinafter "Essar" value or data).  This value of 0.17 rupees per kilogram is derived from data on shipments totaling 4,000 metric tons.

> [The] November 2002 - September 2003 data of Pidilite Industry (Pidilite) originally submitted in the antidumping investigation of carbazole violet pigment 23 from India (hereinafter "Pidilite" value or data).  This value of 6.48 rupees per kilogram is derived from data on shipments totaling 13 metric tons.

Pls.' Mem. 47 (citing Factors of Production Valuation Mem. for the Preliminary Results and Partial Rescission of Antidumping Duty Admin. Review of Honey from the PRC dated Dec. 9, 2005, AR 229 at 10).

Plaintiffs argue that only the Essar data should be used because: (1) the Essar data is more contemporaneous; and (2) the Pidilite data has an "aberrationally high brokerage and handling value based on a very low sales quantity."  Pls.' Mem. 48.

Commerce acknowledges that the Essar data is the most contemporaneous data on the record, as it overlaps with the POR.  Issues & Dec. Mem. at 25.  However, it states that "when considering the quality and specificity of the data on the record, *e.g.*, Essar and Pidilite's brokerage and handling values,

calculating an average of the two values results in the most appropriate value on the record in this case."  *Id.* (footnote omitted).  Commerce found that a simple average achieved the most representative value considering the values reported: "[A]s there are no honey-specific brokerage and handling values on the record, the Department finds that a simple average of Essar and Pidilite's values achieves the most representative value." Issues & Dec. Mem. at 25.[21]

Moreover, the Department claims that "the Pidilite value from the period October 1, 2002, through September 30, 2003, is not distant enough from the POR in this case (December 1, 2003 through November 30, 2004) for it to be disqualified for use." Issues & Dec. Mem. at 25 (citing *Hebei II*, 29 CIT at 301, 366 F. Supp. 2d at 1275 ("[t]hree months of contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the POI.")).

"Despite the broad latitude afforded Commerce, its discretion is not unlimited, but must be exercised in a manner consistent with underlying objective of [the statute]——to obtain the most accurate dumping margins possible."  *Hebei Metals & Minerals Imp. & Exp. Co. v. United States*, 28 CIT 1185, __, Slip

---

[21]     In addition, Commerce found the average of the data was the most representative because "the values reported by Essar and Pidilite are the actual prices paid by market economy companies and are representative of their normal business practices." Issues & Dec. Mem. at 25-26.

Op. 04-88 at 10 (July 19, 2004) (quotation omitted) (not reported

in Federal Supplement) ("*Hebei I*");  *see also Shakeproof,* 268

F.3d at 1382 ("In determining the valuation of the factors of

production, the critical question is whether the methodology used

by Commerce is based on the best available information and

establishes antidumping margins as accurately as possible.").

Commerce acted within its discretion when it concluded that, in

the absence of data more specific to honey, the several months'

difference in contemporaneousness was not material, and thus that

the Pidilite data should not be excluded on that basis alone.

Commerce's determination that use of a simple average of the data

constituted the best available information for valuing brokerage

and handling, however, does not appear to be supported by

substantial evidence.  Commerce states that the Pidilite data

constitutes the best available information for valuing brokerage

and handling because of the data's "quality and specificity."

The Department at no point, however, explains how the data meets

either one of these standards.

     "An agency must explain its rationale . . . such that a

court may follow and review its line of analysis, its reasonable

assumptions, and other relevant considerations.  Explanation is

necessary . . . for this court to perform its statutory review

function."  *Shanghai Eswell,* 31 CIT at __,  Slip Op. 07-138 at 10

(citing *Int'l Imaging Materials, Inc. v. United States Int'l*

*Trade Comm'n,* 30 CIT __, Slip Op. 06-11 at 13 (Jan. 23, 2006)

(not reported in the Federal Supplement)).  Such an explanation

is particularly important because, as plaintiffs point out:

> The Pidilite brokerage charge is derived from
> only 19 sales consisting of only 13 metric
> tons of merchandise, resulting in a weighted
> average brokerage fee of 6.48 Rs/kg.  By
> contrast the Essar brokerage charge was
> derived from over 4,000 metric tons of
> shipments with a weighted average brokerage
> fee of 0.17 Rs/kg.  Thus, the Pidilite
> brokerage charge is more than 37 times
> greater than the Essar value . . . .

Pls.' Mem. 48 (citations omitted).  Plaintiffs conclude that

"record evidence clearly demonstrates that the Pidilite

represents an unrepresentative and aberrational brokerage value."

*Id*.  Plaintiffs and the court are entitled to an explanation for

Commerce's use of the Pidilite data, and therefore, this matter

is remanded.

CONCLUSION

For the foregoing reasons, the court grants the plaintiffs' motion for judgment on the agency record, in part, and denies it in part.  The court remands this case to Commerce for further action consistent with this opinion.

On remand Commerce shall make specific reference to the questions raised in this opinion, as follows.  (1)  Commerce shall reconsider and explain its decision not to include expenses for jars and corks in its financial ratio calculations as direct expenses used for producing finished honey.  If Commerce concludes that the expenses for the jars and corks should be taken into account in the financial ratio calculations, it shall make the necessary adjustments. (2) Commerce shall reconsider and explain how its regulations for determining the cost of labor conform to the antidumping statute, with specific reference to the reliance on data from countries whose level of development is not comparable to the PRC, and how its insistence that it need not alter its database for the wage rate calculation conforms to its behavior in other cases.  In the event that Commerce concludes that its regulations do not conform to the antidumping statute, it shall propose a method for determining the cost of labor that does conform to the statute. (3)  Commerce shall reconsider and explain its use of the Pidilite data in calculating the brokerage and handling value with particular

reference to "quality and specificity."  Should Commerce conclude
that its use of the Pidilite data is not justified it shall
recalculate the brokerage and handling value using only the Essar
data.


                                        /s/Richard K. Eaton
                                          Richard K. Eaton


Dated:     June 16, 2008
           New York, New York